IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Catherine Wynne Carter, | CASE NO. 1:22-cv-01516 |
| Plaintiff, | DISTRICT JUDGE<br>Christopher A. Boyko |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| Commissioner of Social Security Administration, | |
| Defendant. | **REPORT &<br>RECOMMENDATION** |

Plaintiff Catherine Wynne Carter filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In July 2019, Carter filed an application for disability insurance benefits alleging a disability onset date of January 6, 2009.[1] Tr. 133. She claimed that she was disabled due to multiple sclerosis (MS) and depression. Tr. 42, 222.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

She was last insured on December 31, 2014.[2] The Commissioner denied Carter's application at the initial level and upon reconsideration. Tr. 136–38, 140–42. In March 2020, Carter requested a hearing before an Administrative Law Judge (ALJ). Tr. 145–46.

On September 30, 2020, an ALJ held a hearing at which Carter and a vocational expert testified. Tr. 35–88. One month later, the ALJ issued a written decision finding that Carter was not disabled. Tr. 110–22. Carter requested review of the ALJ's decision, and, in August 2021, the Appeals Council vacated the hearing decision and remanded the case. Tr. 126–30. The Appeals Council found that further consideration was warranted because the ALJ did not exhibit or consider additional evidence that Carter had submitted and because the ALJ did not determine the severity of Carter's obesity and did not address the degree to which obesity may have affected Carter's residual functional capacity (RFC).[3] Tr. 128–29.

---

[2]    To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before his or her last-insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022). Carter was last insured on December 31, 2014, and thus needed to establish disability on or before that date. Tr. 113–14. Since she alleges a disability onset date of January 6, 2009, the relevant period of time for claim runs from January 6, 2009, through December 31, 2014.

[3]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

In its order, the Appeals Council directed the ALJ to:

- Consider all evidence submitted prior to the decision and discuss rationale for admitting or excluding it in accordance with 20 CFR 404.935(a).

- Further evaluate the claimant's medically determinable impairments including obesity to determine to what extent they limit the claimant's ability to perform basic work activities (Social Security Ruling (SSR) 19-2p).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and SSR 85-16 and 96-8p).

- Give further consideration to whether the claimant has past relevant work and, if so, can perform it (20 CFR 404.1560(a)-(b)). If warranted, obtain vocational expert evidence to assist in evaluating whether the claimant can perform past relevant work.

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (SSRs 83-14 and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected

Characteristics of Occupations (SSR 00-4p).

Tr. 129.

In September 2021, the ALJ issued a second decision finding that Carter was not disabled. Tr. 15–27. The decision became final in June 2022, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981.

Carter filed this action in August 2022. Doc. 1. She asserts the following assignments of error:

1. The ALJ erred when she issued an on[-]the[-]record decision after the Appeals Council remanded the matter.

2. The ALJ erred at Step Two of the Sequential Evaluation when she failed to find that Carter's depression was a severe impairment.

3. The ALJ erred at Step Three of the Sequential Evaluation when she failed to properly evaluate Carter's multiple sclerosis in combination with her obesity and fatigue.

4. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling (SSR) 16-3p and found that the effect of the combination of Carter's symptoms allowed her to engage in substantial gainful activity on a full-time and sustained basis.

Doc. 8, at 1.

## Factual background

### 1. *Personal and vocational evidence*

Carter was born in January 1968 and was 41 years old on the alleged disability onset date. Tr. 26, 133. After graduating from high school, she

4

obtained a Bachelor of Arts degree in psychology from the University of Syracuse, a Master of Business Administration (MBA) degree in marketing from Case Western Reserve University, and a certificate in non-profit management. Tr. 46. Carter worked as a director of development until her alleged disability onset date in January 2009, and as a part-time consultant until 2011. Tr. 49–51, 52, 55, 235.

> 2. *Medical impairment evidence*[4]

> > *2.1: Before December 31, 2014 (date last insured)*

In her early twenties, Carter experienced symptoms that led to her being diagnosed with MS at age 22. Tr. 523, 591. Carter's MS abated and she was asymptomatic for many years. *Id.* During Carter's pregnancy in 2006, her MS recrudesced.[5] Tr. 591.

In December 2008, just prior to her alleged disability onset date, Carter saw neurologist Joseph Zayat, M.D., who had been treating Carter for MS. Tr. 590–92. Dr. Zayat noted that Carter had a "constellation of symptoms including recurrent left optic neuritis."[6] Tr. 591. Carter told Dr. Zayat that she had been experiencing a constant "burning, hot, cold" pain—with a severity

---

[4]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[5]    Recrudescence is "the recurrence of symptoms after a temporary abatement." Dorland's Illustrated Medical Dictionary 1583 (33rd ed. 2020).

[6]    Optic neuritis is inflammation of the optic nerve. Dorland's Illustrated Medical Dictionary 1245 (33rd ed. 2020).

level that was "2/10"—in her limbs and trunk for the past two years. Tr. 590. She indicated that she had no difficulty performing or completing routine activities of daily life. Tr. 591. Carter was concerned about what she perceived to be an abnormal gait, and, as a result, she was careful and cautious when walking. *Id*. Carter said that her sense of balance temporarily deteriorated when she exercised. *Id*. She had pain in her left eye that she was attributing to optic neuritis. *Id*. She did not have any bladder dysfunction. *Id*. Carter didn't type and write as quickly as she once did. *Id*. Dr. Zayat found Carter to be attentive, cooperative, and oriented, with a normal appearance and depressed affect. Tr. 592. Carter's extremities were normal, though she had a "hint of a limp" in her gait "with a slightly widened base[]."[7] *Id*. Carter had a normal cranial nerve, her visual fields were full, and her coordination, sensation, motor system, and hand grip were normal. *Id*. Dr. Zayat prescribed Avonex and told Carter to return in two months for a follow-up. *Id*.

Throughout 2009 and 2010, Carter continued to take Avonex despite persistent complaints of MS symptoms—bladder issues, fatigue, weakness—and issues with balance, cognitive function, and gait. *E.g.*, Tr. 558, 563, 564 (bladder issues), 568–69, 575, 584 (fatigue and weakness), 587. Sometimes, Dr. Zayat found that Carter's gait was abnormal, *e.g.*, Tr. 564, 569, 584; other

---

[7]    The walking base is the side-to-side distance—measured in millimeters—between the line of the two feet. *Normal Gait, Foot Placement*, GAIT ANALYSIS (4th ed. 2007), https://www.sciencedirect.com/topics/nursing-and-health-professions/stride-width. It is usually measured at the back of the foot at the midpoint of the heel. *Id*.

times, it was normal, *e.g.*, Tr. 559, 588. Carter's motor system was normal and symmetric. *See, e.g.*, Tr. 564, 575, 584. Usually, Carter's mental status was normal, *e.g.*, Tr. 559, 564, 569, 575, 584, though occasionally, she reported being depressed, *e.g.*, Tr. 588.

In May 2010, Dr. Zayat changed Carter's MS medication to Copaxone. Tr. 550. After three months, Carter had not had any acute recrudescence but she also hadn't experienced any symptomatic relief. Tr. 544. Carter said that she had trouble driving, walking, and caring for her young son. Tr. 544. Her coordination and motor system, which showed no pronator drift, weakness, atrophy, or fasciculations, were normal.[8] Tr. 544. Carter's gait had changed. Her walking base was wider than it had been, and her stride was shorter. Tr. 545. The sensory response in Carter's lower left leg had diminished. Tr. 545. In November 2010, Carter said that she felt as if her "overall functional profile" had "noticeably regress[ed]." Tr. 540. Dr. Zayat changed Carter's MS medication to Gilenya and scheduled her to return in three months for a follow-up. Tr. 542.

Initially in 2011, Carter reported some side effects with Gilenya and Dr. Zayat noticed lingering gait abnormalities. Tr. 523, 531. By midyear, however, Carter's gait, motor system, and coordination were normal. Tr. 495. She was

---

[8]    A fasciculation is "a small local contraction of muscles, visible through the skin, representing a spontaneous discharge of a number of fibers innervated by a single motor nerve filament." Dorland's Illustrated Medical Dictionary 675 (33rd ed. 2020).

attentive, oriented, and cooperative, with a euthymic mood and affect.[9] Tr. 494–95. Carter denied needing assistance from any supportive device to walk, but she was afraid to carry her son. Tr. 494. Carter reported fatigue, bladder dysfunction, and vision issues. *Id*.

In May 2011, an MRI showed multiple brainstem lesions and "innumerable T2 hyperintense lesions" along Carter's spinal cord "from C1–T2."[10] Tr. 749–51. The interpreting radiologist noted that such findings were consistent with a diagnosis of MS. *Id*. In June, occupational therapist James Ives conducted a cognitive assessment. Tr. 496–97. Carter's memory and constructional ability[11] scored in the low average range, which Ives said could

---

[9]     Euthymia describes the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline, https://www.healthline.com/health/euthymic (last visited Feb. 2, 2023). A euthymic person has a calm and steady mood, and typically experiences cheerfulness and tranquility with an increased resilience to stress. *Id*.

[10]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. Thomas Scioscia, MD, *Vertebrae in the Vertebral Column*, Spine–health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited June 12, 2023). The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five in the lower spine—the lumbar spine—are L1 through L5. Id. And the five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, *Sacrum (Sacral Region)*, Spine–health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited June 12, 2023).

[11]    Constructional ability is the ability to copy or draw shapes, figures, or lines. *Constructional Ability*, The Free Medical Dictionary https://medical-dictionary.thefreedictionary.com/constructional+ability (last visited June 12,

have been "influenced by [Carter's] pre-existing depression and anxiety." Tr. 496. He suggested that she undergo a "full" neuropsychiatric evaluation, take a driving test, and begin a home exercise program for her core and trunk. *Id*. In July 2011, Carter received Botox injections to address her neurogenic bladder issues. Tr. 490.

In December 2011, Dr. Zayat noted that the "main features" of Carter's MS were optic neuritis in her left eye and difficulty ambulating. Tr. 485. In addition to Gilenya, he prescribed Ampyra to improve ambulation.[12] Tr. 488. Carter's gait improved with medication, though she began to have swelling and arthralgia[13] in her knees which added a musculoskeletal component to her gait issues. Tr. 485. Carter was exercising regularly—30 minutes daily on the treadmill—and hadn't had any recent optic neuritis symptoms. Tr. 485. She was attentive, oriented, and cooperative, and had a normal gait, normal motor system, normal coordination, and a normal cranial nerve. Tr. 486. Dr. Zayat described Carter's MS as having started initially as relapsing remitting but he noted that her relapses had decreased over the years. *Id*. When Carter

---

2023). It requires the integration of several higher brain functions including perception, planning, and motor coordination. Medical Dictionary. *Id*.

[12]    Ampyra is prescribed to improve ambulation in people with MS. *Ampyra*, WebMD Drugs & Medication database, https://www.webmd.com/drugs/2/drug-153649/ampyra-oral/details (last visited June 6, 2023).

[13]    Arthralgia is joint stiffness. *Arthralgia*, Johns Hopkins Health, Conditions and Diseases, https://www.hopkinsmedicine.org/health/conditions-and%20diseases/arthralgia (last visited June 12, 2023).

mentioned being concerned about the "degree of [her] motor disability," Dr. Zayat explained that he found her "very functional" and estimated that she would be "about [a] 3" on the Kurtzke Expanded MS Disability Status Scale.[14] Tr. 486. Also in December 2011, at a follow-up Botox appointment, the nurse noted that until the first round of injections wore off, Carter's bladder issues had improved "100%." Tr. 482–83.

By April 2012, Carter was still taking Ampyra and Gilenya, and tolerating them well. Tr. 476–77. Dr. Zayat noted that Carter had previously taken "disease modifying agents including Avonex which made her very depressed" and found that she had a normal mental state. Tr. 476. Nonetheless, Dr. Zayat recorded that "Carter had been told that she looked better[,] … she insist[ed that] she does not feel better and … very clearly [indicated] that she [was] under tremendous stress" and feeling "very unhappy and depressed." *Id*. Her gait and motor system were normal. Tr. 477.

In May 2012, at a follow-up Botox appointment, the nurse again recorded a "100% improvement" in Carter's bladder issues following the previous round of injections. Tr. 474. Later that same month, Carter saw her

---

[14]     The Kurtzke Expanded Disability Status Scale (EDSS) is an objective measure of disability status, or the level of functioning and disability, in a person with MS. *Kurtzke Expanded Disability Status Scale*, https://www.va.gov/MS/Professionals/Diagnosis/Kurtzke_Expanded_Disabilit y_Status_Scale.asp (last visited June 6, 2023). The scale ranges from 1.0—a normal neurological exam—to 10—death due to MS. *Id*. A score of 3.0 means that the person is moderately disabled in one functional system or has mild problems in three or four functional systems, but is still fully ambulatory. *Id*.

internist for an annual comprehensive medical evaluation. Tr. 471. Carter said that she was "doing well in general" and had no complaints or concerns. Tr. 471. She reported walking a mile on the treadmill daily, hydrating,  and starting to eat healthier meals including fruits and vegetables. Tr. 471. The doctor described Carter's gait as "slow and shuffling but steady [and] without assistance." Tr. 472.

In September 2012, Carter had a follow-up Botox appointment for her bladder issues. Tr. 466–67. The nurse recorded the resolution of her bladder issues after the previous rounds of Botox. Tr. 466.

In October 2012, Carter had an appointment with Dr. Zayat; she reported that she had fallen a few times. Tr. 464. Carter denied needing a supportive device for ambulation and said that she was able to walk "a distance," though she made conscious efforts to reduce the risk of a fall. Tr. 465. Carter's mental status, gait, and motor system were normal. Tr. 465. In December, Carter had another follow-up Botox appointment for her bladder issues. Tr. 462–63.

In 2013, Carter had been tolerating Gilenya well without any adverse effects; during a February appointment with Dr. Zayat, Carter said that she had noticed improvement in her gait. Tr. 459. Dr. Zayat observed Carter's balance to be normal and found that she had no loss of fine motor skills, no change in vision, and no change in bladder function, though he mentioned that Carter needed to keep up with the regular Botox injections "to allow a better

voiding." Tr. 459, 465. Carter explained that she felt more energetic than usual and had just returned from vacation. Tr. 459. Dr. Zayat found Carter's mood to be much better than it had been before. *Id.*

In March 2013, Carter saw Dr. Zayat for a "routine exam for insurance paperwork" at which he described Carter as a "45 [year old] female with depression and MS" who had arrived at the appointment with "no new complaints." Tr. 456. In May, Carter had a Botox appointment to treat her bladder issues. Tr. 448. In June, Carter saw Dr. Zayat. Tr. 446–47. She continued to tolerate Gilenya well. Tr. 446. Dr. Zayat wrote that clinically, Carter was "very stable" as compared to how she had been previously, "when she had difficulty walking that interfered with [her] everyday life and limited [her] physical endurance." *Id.* Carter's gait, motor system, and coordination were normal. Tr. 447. Her mental status was normal and she had a euthymic mood and affect. *Id.*

In December 2013, Dr. Zayat found that Carter's balance had "qualitative[ly] decline[d]" and Carter said that her ability to walk had been reduced to a quarter of a mile. Tr. 439. Dr. Zayat observed that Carter had an antalgic gait[15] due to pain in her right knee, but he found her motor functioning

---

[15]    An antalgic gait is a disruption in a person's walking pattern that is usually caused by pain. *Antalgic Gait: Causes, Symptoms, and* Treatment, Healthline, Health Conditions, https://www.healthline.com/health/antalgic-gait (last visited Feb. 24, 2023).

and coordination normal. Tr. 440. Carter had a normal mental status with a euthymic mood and affect. *Id*.

Carter saw Dr. Zayat in June 2014. Tr. 424–26. Carter had been having problems with ambulation and balance, *see* Tr. 425 (reporting falls while walking and getting out of a car), but when Dr. Zayat examined her, he found that her gait and motor function were normal. Tr. 424–25. She complained of bladder dysfunction, fatigue that was exacerbated by exercise, tingling and numbness, and "residual visual deficits from previous optic neuritis." Tr. 425. Later that month, Carter had a follow-up Botox appointment during which she again discussed how her bladder issues resolved after the injections. Tr. 424. It had been three and a half months since Carter last received injections, so the Botox had worn off. See Tr. 424.

In December 2014, Dr. Zayat noted that although Carter claimed that her balance issues prevented her from walking any significant distance, she was able to walk independently without relying on any supportive device. Tr. 417. Carter was attentive, oriented, and cooperative, though depressed, and a recent MRI showed no enhancing lesions and no change in brain atrophy or other MS signals. *Id*. Carter described having weakness and numbness with paresthesia[16] in her legs that worsened her gait. *Id*. On examination, however,

---

[16]    Paresthesia is an abnormal touch sensation, such as a burning or prickling feeling, that occurs without an outside stimulus. *Paresthesia*, National Cancer Institute Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/paresthesia (last visited June 6, 2023).

Dr. Zayat found that Carter was able to stand from a seated position without losing her balance. Tr. 418. She could walk with her hands behind her back without displacing her arms. *Id*. As far as her gait was concerned, Carter's stride was normal, though Dr. Zayat "sensed" that Carter was slightly dragging her left leg. *Id*.

### 2.2: After December 31, 2014 (date last insured)

In January 2015, Carter had a follow-up Botox appointment for her neurogenic bladder issues. The Botox treatment continued to resolve her bladder problems. Tr. 416.

In March 2021, Carter's sister Helen assisted Carter to complete a Function Report. Tr. 284–91.

In June 2021, consultative physician Dorothy Bradford, M.D., conducted a disability examination and generated a Consultative Examination Report. Tr. 1306–13. Carter reported having fatigue, back pain, poor balance, and depression. Tr. 1312. At that time—June 2021—Dr. Bradford found that Carter had well-controlled MS, low back pain, "likely" spondylolisthesis, and depression. Tr. 1313. As a result, Dr. Bradford opined that Carter was limited to sedentary activity. *Id*.

In May 2022, Carter's former pastor, her friend Robert, and her sister Helen drafted letters in support of Carter's disability application. Tr. 8–11.

3.  *State agency and other medical opinion evidence*[17]

In August 2019, state agency physician Mehr Siddiqui, M. D., reviewed the medical evidence and opined that Carter had a primary severe impairment due to MS and a secondary severe impairment due to depressive, bipolar, and related disorders. Tr. 92. Dr. Siddiqui found that Carter could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand or walk (with normal breaks) for a total of six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; and had additional postural and environmental limitations. Tr. 94–96. Dr. Siddiqui opined that Carter was not disabled but was limited to light exertion. Tr.  92, 97.

In January 2020, upon reconsideration, state agency physician Gail Mutchler, M.D., reviewed the medical evidence and agreed with most of Dr. Siddiqui's findings. Tr. 106–08. Dr. Mutchler limited Carter further than Dr. Siddiqui, however, in finding that Carter was able to stand and/or walk for a maximum of four—not six—hours in an eight-hour workday. *Comp*are Tr. 94, *with* Tr. 106.

---

[17]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In August 2019, state agency psychologist Paul Tangeman, Ph.D., reviewed the medical evidence and found that although Carter had a documented diagnosis of depression, evidence pertinent to the relevant time period—from the alleged onset date through the last insured date—was "overall" insufficient. Tr. 93. He was thus unable to evaluate Carter's mental health claims. Tr. 93.

In March 2021, upon reconsideration, state agency psychologist Karla Delcour, Ph.D., reviewed the record and agreed with Dr. Tangeman. Tr. 105.

### 4.  Testimonial evidence

Carter and a vocational expert testified during the hearing in June 2021. Tr. 35–88. Carter was represented by attorney Michael Liner. Tr. 35. Carter had been advised that December 31, 2014, the last insured date, was the "most important issue in the case," and Attorney Liner confirmed that Carter was prepared to testify about events on and before that date. Tr. 42.

Carter was 41 years old at the start of the relevant time period and 46 years old when it ended. Tr. 46. She lived with her husband and son, who was born in 2006. Tr. 44, 45. Carter drove a vehicle regularly during that time and has never had any restrictions on her driver's license. Tr. 46–47. She attended Syracuse University as an undergraduate and Case Western Reserve University for graduate school, where she obtained her MBA. Tr. 46. She specialized in nonprofit management. Tr. 46.

Carter and the ALJ discussed Carter's past work as a director of development for several non-profit entities. Tr. 48–64. Carter discussed how MS had made it increasingly difficult for her to work. Tr. 56. She said that she wouldn't have been able to work full-time during the relevant time period because her MS caused exhaustion that was exacerbated by "extreme depression." Tr. 64–65. Carter explained that her MS and depressive disorder, in combination, decreased the effectiveness of her brain and reduced her mental functioning until she was no longer able to write grants and organize events with millions of dollars at stake. Tr. 64–65. Carter's issues—eye problems, difficulty walking, and problems with her hands that impeded her ability to type, hold, and carry items—made working "way more difficult than it had been." Tr. 66.

In her personal life, Carter was able to manage the routine activities of daily living for her household and family with her husband's assistance. Tr. 66. During the relevant time period, Carter could make her bed and was able to clean if she needed to "in a pinch[.]" Tr. 66, 68. But she was not able to mop floors, use a vacuum cleaner, clean a bathtub, or do yardwork. Tr. 68–69. Her husband shopped for the groceries, cooked the meals, and did the laundry. Tr. 69–70. Carter could dust, but her husband usually did that, too, because Carter has allergies. Tr. 69. If Carter were home alone during the day, she needed to get creative in order to function. Tr. 67–68 For example, she used a car key to puncture the top of a yogurt container. *Id*. While her son was still a baby,

17

Carter arranged for a friend to come over to assist her in cooking meals, feeding the baby, and babysitting while Carter rested. Tr. 70–71. When Carter's son started daycare in 2010, Carter's husband handled the daily pick-up and drop-off. Tr. 69–70.

When Carter was working, she took extra bathroom breaks because of her bladder issues. Tr. 75–76. Even though she limited her liquid intake to reduce the frequency of her need to urinate, Carter estimated that she still went to the bathroom every two hours. Tr. 76. Her bladder issues improved with the Botox injections, but Carter said that her body still needed time to adjust after every round, and until that happened, she needed to get to a bathroom often, and quickly. *Id*. In case she didn't make it in time, Carter said, she always wore protection, like an adult diaper, at work. *Id*.

The ALJ asked whether Carter recalled any other symptoms or limitations during the relevant time period that would have affected her ability to work. Tr. 77. Carter said that numbness in her feet made it difficult to walk and "horrible" intermittent vertigo nauseated her. *Id*. Her use of her upper extremities was limited due to prior bilateral hand surgeries and her use of her lower extremities was limited because she was born with bad knees. Tr. 77–78. Old age made these physical conditions worse. Tr. 78. Carter had vision issues that got worse as the day progressed and when she was tired. *Id*.

Vocational expert Kathleen Reis also testified. Tr. 80–88. Reis and the ALJ discussed Carter's work as a director of development, which Reis

classified as skilled, sedentary work under the Dictionary of Occupational Titles (DOT), but noted that it required a medium level of exertion as performed by Carter. Tr. 81–82.

Reis said that if a hypothetical individual with the same age, education, and work experience as Carter had the limitations assessed in Carter's RFC, described below, such an individual would be able to perform Carter's job as director of development as listed in the DOT, but not as actually performed by Carter. Tr. 81. Reis said that within the RFC, an individual like Carter could perform unskilled, light work like a cashier in a parking garage, where the worker typically sat at his or her "workstation without it being an accommodation." Tr. 82. According to Reis, an individual like Carter could also perform unskilled, light work such as a stock checker, order caller, or ticket seller. Tr. 82–83. This hypothetical individual would be precluded from all work if he or she took additional 10-minute breaks every hour or was absent more than two days per month on an ongoing basis. Tr. 83.

### The ALJ's decision

Following remand from the Appeals Council, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since January 6, 2009, the alleged onset date (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: multiple sclerosis and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record [] through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with lifting and carrying up to 20 pounds occasionally and 10 pounds frequently[;] standing and walking for four hours in an eight-hour day[; can] occasionally climb[] ramps and stairs, never climb[] ladders, ropes, and scaffolds; [can] occasionally balance, stoop, kneel, [and] crouch, and frequently crawl; and [that she] was limited to frequent exposure to extreme cold, extreme heat, humidity, and vibration, and occasional exposure to hazards [such as] unprotected height [and] dangerous machinery[].

6. Through the date last insured, the claimant was capable of performing past relevant work as a development director. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also could have performed, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 404.1569, 404.1569a). Therefore, I make the following alternative findings for step five of the sequential evaluation process[:]

The claimant was born [in January 1968] and was 41 years old, which is defined as a younger

individual age 18–49, on the alleged disability onset date (20 CFR 404.1563). The claimant has at least a high school education (20 CFR 404.1564). Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time during the period in question of January 6, 2009, through December 31, 2014, the date last insured (20 CFR 404.1520(f)).

Tr. 21–27.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

21

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which

"a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

*Issue 1: Challenging the ALJ's issuance of the September 2021 decision on the record without taking additional testimony or providing notice of her intention to proceed as such.*

Carter challenges the ALJ's reliance on the existing record, rather than conducting another hearing, following the Appeals Council's order of remand vacating the initial decision. Doc. 8, at 7–8. Carter argues that when the ALJ proceeded on the record alone, she violated Carter's due process rights.

Carter's argument, however, fails at the starting gate. First, because Carter's argument is undeveloped and perfunctory, she has forfeited it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Second, she ignores the fact that the remand order didn't require the ALJ to hold an in-person hearing unless the ALJ deemed it necessary to "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." Tr. 129; *see* Tr 19 (ALJ noting that "the Appeals Council did not direct [her] to offer the claimant an opportunity for a new hearing"). Carter doesn't assert that it was necessary to obtain additional evidence from a vocational expert. So there's no basis to conclude that the ALJ was required to hold an in-person hearing.[18]

---

[18]     Indeed, as the Commissioner notes, applicable agency rules provide that in this circumstance, the Appeals Council was not required to order the ALJ "to offer the claimant the opportunity for a new hearing." https://www.ssa.gov/OP_Home/hallex/I-03/I-3-7-40.html; *see* Doc. 9, at 8–9.

Further, Carter doesn't explain how she suffered prejudice as a result of the due process violation that she says occurred. And because prejudice is an essential component of a due process claim, *Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020), Carter's argument fails.[19]

The ALJ followed the Appeals Council's directive to consider all evidence submitted prior to the issuance of the initial decision and discuss the rationale behind the decision to admit or exclude such evidence. Tr. 129; *see* Tr. 19, 1181–1314. The ALJ also complied with the Council's directive requiring further evaluation of Carter's medically determinable impairments, including obesity, and the extent to which these impairments limited her ability to perform basic work activities. Tr. 129. On the issue of obesity, the ALJ wrote:

> I have determined that the claimant's obesity is a severe impairment but even though her obesity is an aggravating factor to her multiple sclerosis, it does not change the claimant's residual functional capacity as found in my decision dated October 14, 2020. …
>
> Through the date last insured, the claimant had the … severe impairments … [of] *obesity* (20 CFR 404.1520(c) and 416.920(c))….
>
> In … conclu[ding] that the claimant does not have an impairment or combination of impairments that

---

[19] Carter's assertion in her reply brief that the ALJ deprived her of the chance to submit certain letters comes too late. *See J. B-K. by E.B. v. Sec'y of Kentucky Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 730 (6th Cir. 2022). And, in any event, she doesn't claim that the letters could have had any influence on the outcome. So Carter's due process argument continues to falter on the issue of prejudice.

> meets or medically equals a listed impairment, …
> *Social Security Ruling 19-2p (evaluating obesity)*
> *[was] specifically considered*.

Tr. 19, 22, 23 (emphasis added). In considering the effects of obesity on Carter's RFC, the ALJ applied the Council's third directive, Tr. 129, to provide an appropriate rationale with reference to specific evidence in the record as to the assessed limitation of light work, writing as follows:

> The evidence indicates that the claimant was also obese. A treatment record dated April 30, 2014 noted a BMI of 40.85 (Exhibit 2F, p. 107). The Clinical Guidelines issued by the National Institutes of Health define obesity as present in general where there is a BMI of 30.0 or above and extreme obesity where there is a BMI of 40.0 or above (See also [SSR] 19-2p). Here, the claimant's obesity was an aggravating factor to her multiple sclerosis and contributed to her limitation to a range of light work.

Tr. 24 (citing Tr. 433).

The Council's fourth directive required the ALJ to engage with Carter's past relevant work. *See* Tr. 129. The ALJ recalled the testimony of vocational expert Reis in finding Carter capable of performing her work as a director of development, which the ALJ indicated was "sedentary skilled work as generally performed and medium work as actually performed." Tr. 25. The ALJ discussed comparing Carter's RFC with the "physical and mental demands of this work and [Reis's testimony] at the hearing … [and finding] that [Carter] was able to perform her past relevant work as a development director as generally performed through her date last insured." Tr. 26 (citing Tr. 81).

As noted, the Appeals Council's final directive to the ALJ began, "*If warranted by the expanded record*, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Carter's occupational base." Tr. 129. The Council continued, providing guidance on the reconciliation of conflicts that may arise between the testimony of the vocational expert and the information in the source materials, and suggesting hypotheticals for the ALJ to ask the vocational expert if desired during any potential remand hearing. *See* Tr. 129. When the ALJ discussed the evidence at transcript pages 1181 to 1314, which was the evidence that had had been added to the expanded record, she correctly noted that none of this evidence concerned the relevant time period of January 6, 2009, through December 31, 2014. Tr. 19.

The ALJ thus provided support for her decision to not offer Carter a hearing. Carter, however, fails to challenge the ALJ's reasoning. Indeed, Carter ignores it and merely argues that the ALJ should have held a hearing so that she could present additional evidence.

*Issue 2: Challenging the ALJ's step-two finding that Carter's depression and neurogenic bladder were non-severe impairments.*

Carter argues that the ALJ erred at step two of the sequential evaluation when she failed to find that Carter's depression and neurogenic bladder were severe impairments. Doc. 8, at 8, 10. Unfortunately, Carter doesn't explain the point of this argument; she ignores the fact that it's irrelevant.

The Sixth Circuit has explained that "[s]tep two is 'a de minimis hurdle' that a claimant clears unless the impairment is only 'a slight abnormality that minimally affects work ability.'" *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (quoting *Anthony v. Astrue*, 266 F. App'x. 451, 457 (6th Cir. 2008)); *see Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). But if an ALJ finds that "any one impairment is … severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps." *McGlothin*, 299 F. App'x at 522. As a result, if an ALJ finds that a claimant "has some severe impairments," and continues with the analysis, "[i]t then bec[o]me[s] 'legally irrelevant' that" the ALJ found that "other impairments were … not severe." *Id.*

Here, the ALJ found that Carter had two severe impairments. Tr. 22. Carter's argument that the ALJ erred by not finding other impairments severe is thus irrelevant. *McGlothin*, 299 F. App'x at 522. As in *McGlothin*, Carter's "claim that the ALJ erred is without merit." *Id.*

Moreover, Carter ignores the discussion that immediately follows the ALJ's determination that Carter's depression was not severe, in which the ALJ explained her rationale and cited substantial evidence in the record in support her finding. The ALJ acknowledged that Carter's Cleveland Clinic records showed a diagnosis of depression and that Carter indicated that she felt depressed at times during the relevant time period despite mental status

28

examinations in which she was consistently normal. Tr. 22 (citing Tr. 417, 465, 588). The ALJ continued, writing that Carter's:

> [t]reatment records indicate that [she] was alert, attentive, well oriented, and cooperative. She was well groomed. She had normal, fluent speech. There was no suggestion of cognitive or memory disturbance. Her affect was normal. Treatment included Effexor and Buspirone. The evidence indicates that the claimant's depression improved with the medication.

Tr. 22 (citing Tr. 412, 417, 418, 447, 460, 465, 477, 486, 495, 525, 532, 534, 543, 559, 563, 567, 569). The cited evidence provides substantial support for the ALJ's finding that depression caused Carter no more than a mild limitation in any area of functioning or the ability to complete basic work-related activities.

Even if relevant, Carter's challenges to the analysis of her depression amount to inappropriate "invitation[s] to reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022). But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (citing *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x 586, 588 (6th Cir. 2019)). Whether, as Carter claims, substantial evidence *could* support Carter's conclusions that she had more severe impairments due to depression than the ALJ found is irrelevant because Carter failed to show that the ALJ's findings were *not* supported by substantial evidence. Carter does not demonstrate any flaw in the ALJ's reasoning. And the ALJ, in her findings, cited substantial evidence in support of her analysis. As previously discussed,

"[s]o long as substantial evidence supports the conclusion reached by the ALJ,"
it doesn't matter if substantial evidence also supports a claimant's position.
*See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Whether substantial
evidence supports the conclusion that Carter's depression could have been
deemed severe is irrelevant unless Carter can show that substantial evidence
did not support the ALJ's determinations, which she failed to do.

Much the same applies to Carter's irrelevant argument about her
bladder. Carter's argument also ignores the ALJ's consideration of Carter's
bladder condition. The ALJ wrote that:

> [d]uring the period in question, the claimant also
> had complaints of voiding and leakage issues and
> was diagnosed with a neurogenic bladder (Exhibit
> 2F, pp. 85, 91, 99, 118). …
>
> She was treated with chemodenervation with Botox
> every three months for her bladder issues, and the
> condition improved.

Tr. 24 (citing Tr. 308, 321, 322, 327, 335, 355, 357, 395, 441).

For the same reasons that Carter's claim about her depression fails,
Carter's argument about her neurogenic bladder fails. She does not
demonstrate how the ALJ's determination was unsupported in the record. To
the contrary, ample evidence in the record supports the finding that Carter's
bladder issues were not a severe impairment. *See, e.g.*, Tr. 76, 416, 424, 448,
459, 462–63, 465, 466–67, 474, 482–83, 490. Carter's claim that substantial
evidence in the record supports an alternative conclusion—that Carter's
neurogenic bladder could have been a severe impairment—is irrelevant unless

Carter shows that substantial evidence did not support the ALJ's opposite determination, which she fails to do.

Accordingly, the Commissioner's step-two findings should be upheld.

*Issue 3: Challenging the ALJ's step-three analysis of Carter's MS under Listing 11.09 in combination with obesity and fatigue.*

The ALJ found that that Carter did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.09 or 11.09B. Carter claims that the ALJ's consideration of Listing 11.09 was inadequate. Doc. 8, at 10–14.

At step three, the ALJ found that Carter did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526). The ALJ wrote that:

> [n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. The record does not establish the medical signs symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairment(s) medically equal a listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment, the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process were also considered and reached the same

> conclusion (20 CFR 404.1527(f).  Listing 11.09
> (multiple sclerosis), and Social Security Ruling 19-
> 2p (evaluating obesity) were specifically considered.

Tr. 22–23.

Carter claims that the ALJ failed to adequately explain why Carter did not meet or equal any of the listings. But an ALJ is not required to reanalyze evidence at each step of the analysis. So if an ALJ reviews relevant evidence in an earlier step of the five-step sequential analysis, she need not recap her review of that evidence during her discussion relevant to a later step. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, the ALJ made "sufficient factual findings elsewhere in [her] decision" to support the findings that she made at step three. The ALJ's explanation, in context, is sufficient.  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (citing *Bledsoe v. Barnhart*, 165 F. App'x. 408, 411 (6th Cir. 2006) (the Court may look to findings elsewhere in the decision to affirm a step-three listing determination … where the ALJ explicitly stated that he had considered the combination of all impairments "even though he did not spell out every fact a second time under the step three analysis."); *Immke v. Saul*, No. 1:18CV2218, 2020 WL 1940849, at *6 (N.D. Ohio Apr. 22, 2020).

In order to meet or equal Listing 11.09A, a claimant must show that his or her MS is marked by disorganization of motor function in two extremities resulting in an extreme limitation in the ability to: (1) stand from a seated position, (2) balance while standing or walking, or (3) use her upper extremities. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09(D)(2)(a)–(c) further explains the criteria. An "extreme limitation" means that the claimant is unable to stand up from a seated position, maintain balance in a standing position and while walking, or use his or her upper extremities to independently initiate, sustain, and complete work-related activities. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09(D)(2). The "inability to stand up from a seated position" means that once seated, he or she is unable to stand and maintain an upright position without the assistance of another person or an assistive device like a walker, two crutches, or two canes. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09(D)(2)(a). The "inability to maintain balance in a standing position" is the inability to maintain an upright position while standing or walking without the assistance of another person or an assistive device like a walker, two crutches, or two canes. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09(D)(2)(b). The "inability to use the upper extremities" means that a loss of function in both upper extremities—including fingers, wrist, hands, arms, and shoulders—very seriously limits the claimant's ability to independently initiate, sustain, and complete work-related activities involving fine and gross

motor movements. 20 C.F.R. Part 404, Subpart P, App. 1, §11.00(D)(2)(c). The inability to perform fine and gross motor movements could include, pertinently, the use of one's hands, arms, and shoulders to handle, grip, grasp, hold, turn, and reach; or the inability to lift, carry, push, and pull. *Id.*

The ALJ's assessment of Carter's limitations and functional abilities, memorized in the RFC, provided sufficient support for finding that Carter did not meet Listing 11.09A. Sufficient evidence in the record, cited elsewhere in the decision, also supports this finding. In the RFC, the ALJ found that Carter was able to sit for up to six hours[20] and stand or walk for up to four hours. Tr. 23, 117. In so finding, the ALJ implicitly found that Carter was able to stand from a seated position and maintain her balance while standing or walking. *See* Tr. 23, *see also* Tr. 418 (Dr. Zayat observing that Carter was able to stand from a seated position without losing her balance.). The medical records contain Carter's repeated denials that she needed any supportive device to assist her walking and mentioning her regular exercise on a treadmill. *See, e.g.*, Tr. 417, 465, 471, 494. Also, Carter's physicians regularly observed her to have a normal gait, normal extremities, normal motor function, and normal

---

[20]     In the initial RFC determination, the ALJ found that Carter was limited to a maximum of six hours sitting in an eight-hour workday. Tr. 117. The ALJ's later RFC determination, which the ALJ asserted had remained the same after record was expanded, Tr. 19, omits any mention of a restriction on sitting. Tr. 23. Whether this was an oversight by the ALJ or a purposeful omission, either scenario supports the finding that Carter was not extremely limited in the ability to stand from a seated position and thus that she did not meet or equal Listing 11.09A.

coordination. *See, e.g.*, Tr. 447, 486, 495, 592, 559, 564, 575, 584, 588. The ALJ found that Carter had the RFC to lift and carry up to 20 pounds occasionally and 10 pounds frequently. Tr. 23. In so finding, the ALJ implicitly determine that Carter had the requisite muscle strength, coordination, sensation, and reflexes to accomplish those tasks. Tr. 24. In addition, the record contains ample support for this finding. *See, e.g.*, Tr. 440, 447, 495, 544, 592. This ability, as determined by the ALJ, also demonstrates the implicit finding that Carter did not have an inability to use her upper extremities. So substantial evidence supports the ALJ's step-three finding that Carter did not meet or equal Listing 11.09A's requirement of an extreme limitation in the ability to stand from a seated position, balance while standing or walking, or use the upper extremities. 20 C.F.R. Part 404, Subpart P., App. 1, §§ 11.09(A); (D)(2)(a)–(c). The ALJ's rationale at step three is well-supported by her findings elsewhere in the decision and provided a sufficient factual basis for the ALJ's analysis.

In order to meet or equal Listing 11.09B, a claimant must show that he or she has MS that is characterized by a marked limitation in physical functioning and a marked limitation in one of the following "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09B. Here, at step two, the ALJ found that Carter "experienced no more

than mild limitations in her ability to understand, remember or apply information; interact with others; concentrate, persist or maintain pace, and adapt or manage oneself[,]" that her "mental impairment caused no more than "mild" limitation in any of the functional areas." Tr. 22. So Carter would not have been able to meet or equal Listing 11.09B's requirement of a marked limitation in one of the "paragraph B" areas.

And any perceived error by the ALJ during her evaluation of Listing 11.09 is harmless because Carter hasn't shown that her impairments could have met or medically equal the severity required to meet or equal the listing during the relevant time period. *Forrest*, 591 F. App'x at 364; *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x. 411, 416 (6th Cir. 2011). Since Carter cannot show that she would have met or equaled the listing and substantial evidence supports the ALJ's finding that Carter did not, the ALJ did not err at step three. The Commissioner's decision should be upheld.

*Issue 4: Challenging the evaluation of subjective symptoms under SSR 16-3p.*

Carter claims that the ALJ failed to articulate any supportable rationale for finding that Carter's subjective statements were not entirely consistent with the medical evidence. Doc. 8, at 17; *see id*. at 17 ("The ALJ failed to note Carter's symptoms which were established by the medical evidence."). Carter claims that the ALJ's determination was erroneous and unsupported by the record. *Id*. Carter says that "contrary to [the ALJ's] language," the ALJ

conducted an insufficient analysis and failed to comply with the requirements of SSR 16-3p. *Id*. I disagree.

SSR 16-3p provides "a two-step process for evaluating an individual's symptoms." SSR 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462, 49,463 (Oct. 25, 2017). At step one, the ALJ should "determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Here, the ALJ cited Ruling 16-3p and applied it. Tr. 20, 23–24. The ALJ found that Carter satisfied step one. She found that Carter's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 24. So the issue is about step two. Under step two, the ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the

factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id*. at 49,465. These

factors are:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at 49,465–66.

The ALJ cited substantial evidence in the record in support of her

finding that Carter's subjective symptoms were: (1) inconsistent with the

observations of Carter's doctors throughout the relevant time period, (2)

alleviated by—and sometimes resolved with—medical intervention, and (3) not

entirely consistent with or supported by the other evidence in the record. *See*

Tr. 24. The ALJ noted that Carter had been diagnosed with relapsing and

remitting multiple sclerosis in 1992 and remained generally asymptomatic

until 2006. Tr. 23–24. The ALJ discussed an MRI that Carter had in 2010, in

which the findings were consistent with a history of MS, as well as treatment

records from December 2014 showing that Carter  had no enhancing lesions

and no change in the number of MS indicating signals and associated atrophy.

Tr. 24 (citing Tr. 320, 417, 507, 443, 485, 501). The ALJ compared Carter's MS-related issues during the relevant period—fatigue, gait issues, balance concerns, numbness in her feet, trouble walking, visual disturbances, left optic neuritis, bladder issues—with objective medical findings of Carter's physicians noting her "normal gait with normal muscle strength, normal coordination, normal sensation, and symmetric reflexes. … ab[ility] to walk without an assistive device[,] … normal cranial nerves with normal visual fields, [normal] eye movements … , and [normal] pupils." Tr. 24 (citing Tr. 349, 356, 395, 418, 425, 439, 465, 442, 444, 468, 473, 473, 479, 485, 498, 501, 502, 544).

Although Carter complained of fatigue, gait disturbances with balance issues, and numbness in her feet, the ALJ noted, "[n]evertheless," most of Carter's physical exams were normal with her physicians regularly observing Carter's "normal gait with normal muscle strength, normal coordination, normal sensation, and symmetric reflexes" and "ab[ility] to walk without an assistive device." Tr. 24 (citing Tr. 418, 425, 439, 465, 442, 444, 544, 468, 473). The ALJ found that during the relevant period, Carter complained of visual disturbances attributed to left optic neuritis, "however," … [Carter's] physical exam showed "normal cranial nerves with normal visual fields, eye movements conjugate without nystagmus,[21]" and [normal] pupils that were reactive to light." Tr. 24 (citing Tr. 349, 356, 395, 473, 479, 485, 498, 501,502).

---

[21]    Nystagmus is the involuntary, usually rapid, movement of the eyeballs. *Nystagmus*, Merriam-Webster online dictionary, https://www.merriam-webster.com/dictionary/nystagmus (last visited June 8, 2023).

The ALJ discussed Carter's improvement and symptomatic relief with medical treatment, including the amelioration of her bladder issues through regular Botox injections, the improvement of her gait with Ampyra, and the reduction of her overall MS symptoms with Galenya. Tr. 24 (citing Tr. 308, 321, 411, 412, 417, 425, 444, 447, 485, 531). The ALJ considered the persistence, severity, and intensity of the symptoms Carter alleged with the objective medical records in which Carter's doctors assessed her overall health as good and described her as "very functional," estimating that she would only be "about a three" on the EDSS scale. Tr. 24 (citing 486, 513). The ALJ noted evidence establishing that Carter was obese during the relevant time period. Tr. 24 (citing Tr. 344 and SSR 19-2p). The ALJ found that Carter's obesity was an aggravating factor to her MS and included it as one factor that led the ALJ to find Carter limited to light work in the RFC. Tr. 24.

Carter fails to show that the ALJ's findings were not supported by the evidence. The ALJ cited the record and cited substantial evidence in support of her findings. As with several of Carter's arguments, this final issue ignores the standard of review and invites the Court to reweigh the evidence, which the Court can't do. *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). As previously stated, the Court reviews the agency's decision under the highly deferential substantial evidence standard. *Rottmann*, 817 F. App'x. at 196. Carter fails to show a lack of support in the record for the ALJ's finding that

her statements about her symptoms were not entirely consistent with the medical evidence.

Carter's claim that ALJ failed to comply with SSR 16-3p is simply not true. The ALJ explicitly followed the two-step analysis required by SSR 16-3p and found, at step two, that Carter's statements regarding the intensity, persistence, and functionally limiting effects of her pain and other symptoms were, at best, partially consistent with the medical and other evidence. Tr. 23–24. The ALJ supported this finding with specific evidence in the record. *Id*. Carter, on the other hand, fails to provide a basis for her claims and does not demonstrate any flaw in the ALJ's reasoning or analysis.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: June 12, 2023

                              /s/ *James E. Grimes Jr.*
                              James E. Grimes Jr.
                              U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)